# In the United States Court of Federal Claims

No. 14-1161C

(Filed: March 17, 2016)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| **AMERISERV TRUST AND FINANCIAL SERVICES COMPANY AS TRUSTEE FOR THE EMPLOYEE REAL ESTATE CONSTRUCTION TRUST FUND,** | Action for damages based upon alleged breach of contract; motion for partial judgment on the pleadings; RCFC 12(c); express warranty; viability of affirmative defenses |
| **Plaintiff,** | |
| **v.** | |
| **UNITED STATES,** | |
| **Defendant.** | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Michael A. Shiner, Tucker Arensberg, P.C., Pittsburgh, Pennsylvania, for plaintiff. With him on the briefs and at the hearing was Gary P. Hunt, Tucker Arensberg, P.C., Pittsburgh, Pennsylvania.

Eric E. Laufgraben, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. for defendant. With him on the briefs were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division, and Robert E. Kirschman, Jr., Director, and Scott D. Austin, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington D.C. Of counsel and present at the hearing were William E. Sexton, Jr., Cameron Gore, Katherine M. Smyth, and Reid Nicolosi, Office of General Counsel, Department of Veterans Affairs.

## OPINION AND ORDER

LETTOW, Judge.

In this action for damages based upon an alleged breach of contract, plaintiff, Ameriserv Trust and Financial Services Company ("Ameriserv"), provided a secured $7.5 million construction loan to VA Butler Partners Company, LLC ("VA Butler Partners"), an assignee and affiliate of Westar Development Company ("Westar"), to enable VA Butler Partners to begin construction of a hospital for the Department of Veterans Affairs ("VA"). Ameriserv made the loan in its capacity as trustee for the Employee Real Estate Construction Trust Fund ("ERECT

Fund").[1]  Its loan to VA Butler Partners was secured by a lease of the hospital to the VA.  Before Ameriserv provided the loan, the government signed a tripartite subordination and non-disturbance agreement with Ameriserv and VA Butler Partners, stating that VA Butler Partners' hospital lease was in full force and effect and that no events had occurred that would ripen into default.  Ameriserv then disbursed the loan.  Subsequently, the government concluded that Westar had committed fraud during the procurement and terminated the hospital lease for default.

Ameriserv claims the government made express warranties that were breached when facts surfaced showing Westar had procured the lease through fraud.  To this end Ameriserv has filed a motion for partial judgment on the pleadings pursuant to Rule 12(c) of the Rules of the Court of Federal Claims ("RCFC").  *See* Pl.'s Br. in Support of Mot. for Partial Judgment on the Pleadings ("Pl.'s Mot."), ECF No. 25; *see also* Pl.'s Mot. for Partial Judgment on the Pleadings, ECF No. 24.  In response, the government argues it did not breach any warranty, and that its affirmative defenses bar judgment on the pleadings.  *See* Def.'s Opp'n to Pl.'s Mot. and Request for Discovery ("Def.'s Opp'n"), ECF No. 31.

## BACKGROUND[2]

### A. *The VA Requests Proposals for a Hospital Lease, Selects Westar for Award, and Denies an Agency-Level Protest*

The VA issued a request for proposals in 2011 for the development and leasing of a hospital in Butler, Pennsylvania.  Am. Compl. ¶ 15; Am. Answer ¶ 15.  On January 10, 2012, Westar submitted a response, and in March of 2013 it submitted a final bid proposal.  Am. Compl. ¶¶ 16, 17; Am. Answer ¶¶ 16, 17.  In May 2012, the VA awarded the lease ("hospital lease") to Westar.  Am. Compl. ¶ 18; Am. Answer ¶ 18.

In June 2012, losing bidder Gilbane/Cedarwood Development ("Gilbane") filed an agency-level bid protest with the government's contracting officer, contending that Westar should not have received the award because it was not a responsible bidder.  Am. Compl. ¶ 19, Ex. D; Am. Answer ¶ 19.  Gilbane asserted that Mr. Robert Berryhill, a principal of Westar, lacked integrity because he was under a criminal investigation by the Federal Bureau of

---

[1]"The ERECT Fund is an open-ended collective investment trust whose investors are qualified pension and benefit funds of various construction trade unions, as well as Highmark Inc. and the Commonwealth of Pennsylvania through allocations to separate but related funds." Am. Compl. ¶ 7.

[2]The complaint was amended to replace two exhibits.  References to the amended complaint ("Am. Compl.") are to ECF No. 1 and its exhibits, with the addition of the exhibits attached to ECF No. 9 (replacing Exhibits L and T of the original complaint).  The government answered the amended complaint, *see* ECF No. 11, and subsequently was granted leave to file an amended answer ("Am. Answer"), ECF No. 18, which stated affirmative defenses that had not previously been presented.  *See* Order of June 29, 2015, ECF No. 19.  The facts of this case are largely undisputed, as the defendant has admitted most of the amended complaint's allegations of fact.  Where Ameriserv's allegations have not been admitted, that circumstance is noted.

Investigation ("FBI") relating to embezzlement from his former employer, which was also a government contractor.  Am. Compl. ¶ 20, 21, Ex. D at 4; Am. Answer ¶ 21.  In addition, the contracting officer had been contacted on June 1, 2012 by the FBI, which told him of the investigation into Mr. Berryhill and requested all proposals submitted by Westar and Mr. Berryhill.  Am. Compl. ¶ 73, Ex. T at 13; Am. Answer ¶ 73.

On July 25, 2012, the contracting officer denied the protest.  Am. Compl. ¶ 23, Ex. E; Am. Answer ¶ 23.  The contracting officer's decision stated that "[t]o determine responsibility, the source selection process relies on information of a specific nature available to the Source Selection Official (in this instance, the C[ontracting ]O[fficer]), which includes certain [g]overnment-maintained data bases, and representations and certifications submitted by each bidder."  Am. Compl. Ex. E at 2.  The contracting officer then concluded that "[a]lthough 'integrity' is indeed a legitimate factor in determining 'responsibility,' there is no evidence of such lack of integrity as Gilbane asserts on the part of Westar *as an entity*, and furthermore, there is no evidence of any such lack of integrity on the part of Mr. Berryhill that could conceivably impute to Westar."  Am. Compl. Ex. E at 2 (emphasis in original).

B. *Westar Seeks Financing to Begin Construction and Applies for Loans from Fifth Third Bank and Ameriserv*

Westar needed financing to begin construction.  Am. Compl. ¶ 36; *see also* Am. Compl. Ex. L ¶ B ("To provide funds necessary to construct [the] medical/office building . . . , Borrower has requested Bank to grant a loan to Borrower.").  It sought and obtained a construction mortgage of $57,500,000 from Fifth Third Bank.  Am. Compl. ¶ 26; Am. Answer ¶ 26.  Fifth Third Bank in turn required Westar to obtain a second construction loan in an amount of $7,500,000.  Am. Compl. ¶ 27; Am. Answer ¶ 27.  Westar applied to Ameriserv for this $7,500,000 loan on January 17, 2013.  Am. Compl. ¶ 29; Am. Answer ¶ 29.

Before disbursing any funds, Ameriserv required the government to meet a variety of conditions, two of which are relevant here.  First, Ameriserv and Fifth Third Bank required Westar to assign the hospital lease to VA Butler Partners ("borrower"), a special purpose entity which would be owned and managed by Westar and serve as the borrower for legal purposes.  Am. Compl. ¶ 30; Am. Answer ¶ 30.  In an agreement dated March 6, 2013, the government approved Westar's assignment of the lease to VA Butler Partners.  Am. Compl. ¶ 31, Ex. C at 1; Am. Answer ¶ 31.

Second, Ameriserv requested that the government provide assurances about Westar's lease, which assurances were contained in a Subordination, Nondisturbance, and Attornment Agreement signed by the government, VA Butler Partners, and Ameriserv.  *See* Am. Compl. Ex. L ("Subordination Agreement" or "Agreement").  The Subordination Agreement stated: "As a condition to the implementation of the Loan, Bank[3] has requested Government confirm certain matters with respect to the lease mentioned in Subsection A afore; and Bank would not grant the

---

[3]The Subordination Agreement uses the term "Bank" to refer to Ameriserv as trustee for the ERECT Fund.

Loan to Borrower but for the execution of this Agreement by Government." Subordination Agreement ¶ C.

Section 1 of the Subordination Agreement was entitled "Representations and Warranties," and began by providing

Government and Borrower represent and warrant as follows:
. . .

1.2     The Lease is in good standing, in full force and effect, and has not been modified, altered, or amended.
. . .

1.5     To the date hereof, Borrower has timely performed all its obligations under the Lease, and no events have occurred which, with notice, the passage of time, or both, would constitute a default under any provisions of the Lease obligatory on Borrower.

Subordination Agreement § 1. Section 2 of the Agreement included further assurances, requiring the government to provide Ameriserv written notice and an option to cure if VA Butler Partners defaulted on the lease. *Id*. § 2.1. The government further agreed that "it shall not invoke any of its remedies under the Lease . . . until Bank has received written notice of such default and an opportunity to cure as provided for herein." *Id*.

In Section 3 of the Subordination Agreement, the government agreed to "subordinat[e] its rights under the Lease at all times and in all respects to the terms, conditions and provisions of the mortgage and/or security interests . . . which will secure the repayment of the Loan and to all renewals, modifications, replacements and extensions thereof." Subordination Agreement § 3. Section 9 set out an integration clause. *Id*. § 9 ("This Agreement sets forth the entire agreement and understanding between the parties as to the subject matter of this Agreement and merges and shall supersede all prior agreements, commitments, representations, writing, negotiations and discussions between them."). Section 9 further provided that "[w]hen inconsistent with the provisions of the Lease, the provision of this Agreement shall be paramount and control." *Id*.

The Subordination Agreement was effective March 27, 2013. Am. Compl. ¶ 47; Am. Answer ¶ 47. Near that time, Ameriserv, Fifth Third Bank, and VA Butler Partners signed loan documents. Am. Compl. ¶ 33, Exs. G - L; Am. Answer ¶ 33. As noted in Subordination Agreement § 3, Ameriserv and Fifth Third Bank took a security interest in the hospital lease. Am. Compl. ¶ 33, Exs. G - L; Am. Answer ¶ 33. At some point between March 28 and April 2, 2013, Ameriserv disbursed the loan to VA Butler Partners. Am. Compl. ¶ 37, Ex. M (showing loan document in which Ameriserv provided $7,500,000 in credit to VA Butler Partners); Am. Answer ¶ 37. On April 5, there was a public groundbreaking ceremony for the hospital's construction, which was attended by numerous representatives of the VA and Westar. Am. Compl. ¶ 41; Am. Answer ¶ 41.

C. *The Government Terminates the Hospital Lease for Default*

While the financing arrangements were being made, in late March 2013 the VA Inspector General received allegations of misconduct against Westar and began to investigate. Am. Compl. ¶ 46, Ex. N (showing the Office of Inspector General Advisory Memorandum ("First OIG Report")); Am. Answer ¶ 46. The Inspector General's "concerns" became "intensified" on April 3, 2013, when the United States filed a criminal information against Mr. Berryhill in the United States District Court for the Northern District of Ohio. First OIG Report at 2; *see also* Am. Compl. ¶ 40 (stating Mr. Berryhill was criminally charged that day); Am. Answer ¶ 40. For three months following these charges, Westar continued work on the hospital, procuring structural steel, fine grading the site, and gathering various materials for construction. Am. Compl. ¶ 42; Am. Answer ¶ 42. Meanwhile, the Inspector General's investigation was proceeding, and it reached a culmination on June 13, 2013 with the issuance of a final report. First OIG Report; Am. Compl. ¶ 43; Am. Answer ¶ 43. The report "concluded that Berryhill and Westar made false and misleading statements in the technical proposal that VA relied on when evaluating the proposal and awarding the lease to Westar." First OIG Report at 3. "But for these false and misleading statements, Westar would not have been awarded the lease." *Id*. In particular, the Inspector General found that Westar's bid proposal falsely asserted that it had "personal integrity," when in fact the Inspector General found "Berryhill had admitted to embezzlement and was under investigation by the FBI." *Id*. at 5. Next, Westar had falsely asserted that it had assets, employees, and a history of other projects. *Id*. The report found that in fact Westar had no assets, employees, or work history. *Id*.

The Inspector General also addressed the Gilbane bid protest, finding that "[t]he contract file shows that information provided to VA as part of a protest filed after the award to Westar raised serious questions regarding the integrity (and thus responsibility) of Berryhill, as an individual, and Westar as a business entity. Documents provided with the protest included records from a civil case in which Berryhill's former employer . . . sued Berryhill and Westar. One of the documents provided was an Order and Opinion issued by [a judge in a civil case that] was based on Berryhill's admission that he had embezzled funds from [his former employer's] project." First OIG Report at 2.

Eight days after the Inspector General's report, on June 21, 2013, the government issued a stop-work order to VA Butler Partners stating that "[d]ue to the ongoing investigation of VA's Office of Inspector General into the companies and parties associated with this lease, all action on this contract is hereby suspended and we advise you to expend no further funds at this time." Am. Compl. ¶ 48, Ex. O; Am. Answer ¶ 48. On July 11, 2013, the contracting officer issued a "show cause" letter to Westar, stating: "It has come to the attention of the [VA] that the proposal you and your company (Westar) submitted to VA on January 10, 2012, during VA's competitive procurement process for the above-subject Lease, contained significant and materially false and misleading information." Am. Compl. ¶ 49, Ex. P; Am. Answer ¶ 49.

Then, on August 9, 2013, the government wrote to Westar and VA Butler Partners terminating the lease "for default." Am. Compl. ¶ 50, Ex. Q; Am. Answer ¶ 50. The letter explained:

VA has determined that Westar made false, misleading, and fraudulent
misrepresentations in its response to Solicitation Number VA101-10-RP-01015
for the Butler Health Care Center, and that, but for its reliance on those fraudulent
misrepresentations, VA would not have awarded the Lease to Westar. Therefore,
VA has further determined that the Lease should be terminated for default.

Westar's and Butler Partners' rights to proceed further under the Lease or any portion
thereof are terminated. I have determined that the failure to perform is not excusable,
that this notice of termination constitutes such decision, and that Westar and/or Butler
Partners has the right to appeal such decision under the Disputes clause of the Lease.

Am. Compl. ¶ 50, Ex. Q; Am. Answer ¶ 50.[4]

### D. *Government Declares the Subordination Agreement with Ameriserv to Be Void*

In a letter dated August 15, 2013, Ameriserv requested that the government reconsider its
decision to terminate Westar's lease. Am. Compl. ¶ 64, Ex. R; Am. Answer ¶ 64. The
government responded on September 4, stating that it would not reconsider and explaining that
because Westar procured the lease through fraud, the Subordination Agreement was "invalid, or
otherwise null and void." Am. Compl. ¶ 65, Ex. S; Am. Answer ¶ 65. Ameriserv replied by
filing a claim with the contracting officer on October 2, 2013. Am. Compl. ¶ 10, Ex. A; Am.
Answer ¶ 10. The contracting officer denied the claim on December 6, 2013. Am. Compl. ¶ 12,
Ex. B; Am. Answer ¶ 12. The contracting officer's denial explained Westar's fraud "tainted" its
hospital lease resulting in it being void *ab initio*, and that this taint extended to the Subordination
Agreement such that it too was void *ab initio*. Am. Compl. Ex. B.

### E. *The VA Inspector General Conducts a Second Investigation of Westar*

After the VA Inspector General issued its First OIG Report, it continued to investigate
the matter and issued a second report on March 31, 2014. Am. Compl. ¶ 71, Ex. T ("Second
OIG Report"); Am. Answer ¶ 71. The report specifically found errors in the contracting officer's
handling of the Gilbane bid protest. It found that protest was made on the "basis" that

Westar failed to disclose that one of its principals, Robert J. Berryhill, had
admitted to embezzling money from his prior employer. . . . Based on advice
and guidance from VA's Office of General Counsel (OGC), on July 25, 2012,
the C[ontracting ]O[fficer] issued a final decision dismissing the protest because
it was without merit. The C[ontracting ]O[fficer] stated that his decision was
based on the fact that there was no indictment or conviction of Berryhill nor
was he debarred or suspended. The C[ontracting ]O[fficer] further stated that
any lack of integrity on the part of Berryhill could not conceivably be imputed

---

[4]The government did not provide Ameriserv with notice and opportunity to cure before
terminating the lease. Am. Compl. ¶ 51. *But see* Am. Answer ¶ 51 (asserting that this is a
conclusion of law to which no answer is required).

to Westar.  Even though VA had dismissed the protest, on the same day, VA issued a cure notice to Westar that expressed concerns that the legal proceedings against Berryhill could endanger the Butler [Hospital] project.

Second OIG Report at 2.  The Second OIG Report also noted that the FBI had contacted the VA contracting officer prior to the Gilbane protest and asked for all proposals submitted by Westar and Mr. Berryhill.  The report explained that

> e-mails obtained during our review show that the FBI had contacted the C[ontracting ]O[fficer] by telephone on June 1, 2012, informing the C[ontracting ]O[fficer] of the FBI investigation of Berryhill and seeking all proposals submitted by Westar and Berryhill. . . . Therefore, there was independent and direct corroboration in VA's files confirming that there was an FBI investigation.  [Next], as noted above, the decision issued by the judge in the civil case, which was provided with the protest, was based on the undisputed fact of Berryhill's embezzlement.  Berryhill admitted to the embezzlement; he did not deny it.  However, OGC erroneously advised that there must be an indictment and conviction to make a non-responsibility determination.  This is inconsistent with FAR provisions regarding responsibility determinations.

Second OIG Report at 13.  The report concluded that

> VA incorrectly dismissed the protest of the award to Westar.  The decision that the protest was without merit was not supported by the evidence.  Although the C[ontracting ]O[fficer] appears to have relied on advice from OGC, the advice was based on factual and legal errors that the C[ontracting ]O[fficer] should have recognized and discussed with OGC.  A detailed review of the materials . . . as well as the C[ontracting ]O[fficer] informing OGC of the confirmed FBI investigation of Berryhill, would have likely resulted in a further investigation . . . and potentially a decision to uphold the protest.

*Id*. at 25.

### F. *Procedural Background*

Ameriserv pleads its claim in terms of four counts.  Count One alleges a breach of contract.  Am. Compl. ¶¶ 78-87.  Count Two alleges a Fifth Amendment taking.  Am. Compl. ¶¶ 88-94.  Count Three alleges detrimental reliance.  Am. Compl. ¶¶ 95-110.  Finally, Count Four alleges unjust enrichment.  Am. Compl. ¶¶ 111-116.  The government answered on April 3, 2015.  On April 7, 2015, Ameriserv amended its complaint by adding two exhibits.  ECF No. 9.  The government filed an amended answer on April 10, 2015.  ECF No. 11.  At that time, the government's answer did not include any affirmative defenses.  Then, two and one-half months later, on June 29, 2015, the government sought leave to file an amended answer adding affirmative defenses.  The court granted this request.  *See* Order of June 29, 2015, ECF No. 19 (granting Defendant's Motion to Amend Pleadings, ECF No. 18).

Ameriserv's motion for partial judgment on the pleadings relates specifically to liability on Count One, the count alleging a breach of contract.  That motion is fully briefed, and a hearing was held on February 25, 2016.

## JURISDICTION

This court has jurisdiction under the Tucker Act, codified at 28 U.S.C. § 1491(a)(2), "to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41, [the Contract Disputes Act ("CDA"),] including a dispute concerning termination of a contract."  To comply with the jurisdictional requirements of the CDA, "the contractor must submit a proper claim" and "must have received the contracting officer's final decision on that claim."  *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1328 (Fed. Cir. 2010).  A suit on the claim must be filed within twelve months of a contracting officer's decision.  41 U.S.C. § 7104(b)(3); *see Guardian Angels Med. Serv. Dogs, Inc. v. United States*, 809 F.3d 1244, 1252 (Fed. Cir. 2016) (declining to decide whether Paragraph 7104(b)(3) is jurisdictional, but noting that "filing deadlines ordinarily are not jurisdictional" (quoting *Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S. Ct. 817, 825 (2013))).  In this instance, Ameriserv filed a proper claim with the contracting officer, Am. Compl. Ex. A, which the contracting officer denied in a final decision on December 6, 2013.  Am. Compl. Ex. B.  Ameriserv filed suit in this court on December 2, 2014.  Accordingly, the court has jurisdiction over Ameriserv's claims.

## STANDARDS FOR DECISION

### A.  *Judgment on the Pleadings Pursuant to Rule 12(c)*

"Judgment on the pleadings for a plaintiff is appropriate where there are no material facts in dispute and the plaintiff is entitled to judgment as a matter of law."  *New Zealand Lamb Co. v. United States*, 40 F.3d 377, 380 (Fed. Cir. 1994) (citing *General Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church*, 887 F.2d 228, 230 (9th Cir. 1989)); *Sikorsky Aircraft Corp. v. United States*, 122 Fed. Cl. 711, 719 (2015) (citing *New Zealand Lamb*), *appeal dismissed*, No. 16-1066 (Fed. Cir. Dec. 14, 2015).  "All allegations of fact by the party opposing the motion are accepted as true, and are construed in the light most favorable to that party."  *Seventh-Day Adventist*, 887 F.2d at 230.  "Thus, when the movant is the plaintiff, it is not entitled to judgment on the pleadings when the defendant's answer 'raises issues of fact that, if proved, would defeat recovery.'"  *United Prepaid Network, Inc. v. United States*, 112 Fed. Cl. 59, 61 (2013) (quoting *Seventh-Day Adventist*, 887 F.2d at 230).

"Similarly, if the defendant raises an affirmative defense in his answer it will usually bar judgment on the pleadings."  *Seventh-Day Adventist*, 887 F.2d at 230.  "But to withstand the motion, those affirmative defenses must be adequately pleaded."  *Westport Ins. Corp. v. Northern Calif. Relief*, 76 F. Supp. 3d 869, 882 (N.D. Cal. 2014) (finding improperly pleaded affirmative defenses did not bar judgment on the pleadings for plaintiff).  At a minimum, affirmative defenses must be pled in sufficient detail "to give the opposing party notice of the affirmative defense and a chance to respond."  *Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*, 411

F.3d 1369, 1376 (Fed. Cir. 2005) (quoting *Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir. 1997)). "Even though the aim [of pleading standards] is to prevent parties from being defaulted for committing technical errors, a defendant nevertheless must plead an affirmative defense with enough specificity or factual particularity to give the plaintiff 'fair notice' of the defense that is being advanced." *Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999).

### B.  *Pleading Fraud, Mistake, and Conditions Precedent as Affirmative Defenses*

When asserting fraud or mistake as an affirmative defense, a defendant "must state with particularity the circumstances constituting fraud or mistake."  RCFC 9(b); *see also Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 (Fed. Cir. 2009).  To meet this standard, fraud "'must be pleaded in detail' – '[t]his means the who, what, when, where, and how' of the alleged fraud." *Exergen Corp.*, 575 F.3d at 1327 (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) (alteration in original)).  "A pleading that simply avers the substantive elements" of fraud, "without setting forth the particularized factual bases for the allegation, does not satisfy Rule 9(b)." *Exergen Corp.*, 575 F.3d at 1326-27 (citing *King Auto., Inc. v. Speedy Muffler King, Inc.*, 667 F.2d 1008, 1010 (C.C.P.A. 1981)).  This "who, what, when, where, and how" standard likewise applies to allegations of mistake. *See, e.g.*, *Walters v. Performant Recovery, Inc.*, __ F. Supp. 3d __, __, No. 14-cv-1977, 2015 WL 4999796, at *2, *4 (D. Conn. Aug. 21, 2015) (collecting cases).

Denials of conditions precedent must also be pleaded with particularity.  RCFC 9(c).  This means the defendant must "state which particular condition precedent" the counter-party "failed to fulfill" and "the reason for the failure." *Myers v. Central Fla. Invs., Inc.*, 592 F.3d 1201, 1224 (11th Cir. 2010); *see also American Top English v. Lexicon Mktg. (USA), Inc.*,  No. 03 C 7021, 2004 WL 2271838, at *11 (N.D. Ill. Oct. 4, 2004) (striking affirmative defense when answer said only that "[plaintiff] has failed to perform conditions precedent and is thus not entitled to bring this lawsuit.").[5]

### C.  *Consideration of Attachments to the Pleadings When Deciding a Motion under Rule 12(c)*

Pursuant to RCFC 10(c), "a written instrument that is an exhibit to a pleading is part of the pleading for all purposes."  The "court may take into account" such written instruments in a motion made under Rule 12 "without converting a motion to dismiss into one for summary

---

[5]Ameriserv argues that the government's affirmative defenses must meet the pleading standards of *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007).  Pl.'s Mot. at 16-17.  Courts are divided on this issue. *See Performant Recovery*, __ F. Supp. 3d at __, 2015 WL 4999796, at *1-*2 (collecting divergent precedents in district courts in the Second Circuit). *Compare Hayne v. Green Ford Sales, Inc.*, 263 F.R.D. 647, 649-52 (D. Kan. 2009) (*Iqbal* and *Twombly* apply to affirmative defenses), *with Lopez v. Asmar's Mediterranean Food, Inc.*, 10-cv-1218, 2011 WL 98573, at *2 (E.D. Va. Jan. 10, 2011) (*Iqbal* and *Twombly* do not apply).  In light of the applicability of Rule 9 to this case, it is not necessary to address whether *Iqbal* and *Twombly* appertain. *See Performant Recovery*, __ F. Supp. 3d at __, 2015 WL 4999796, at *2.

judgment." *Anwar v. Fairfield Greenwich Ltd.*, 831 F. Supp. 2d 787, 791 (S.D.N.Y. 2011) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)).  The written instruments attached to the pleadings in this case include the contracts and loan documentation, *see Northern Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452-53 (7th Cir. 1998), as well as the government contracting officer's decisions, *see Total Eng'g, Inc. v. United States*, 120 Fed. Cl. 10, 12 n.1 (2015).  In breach of contract cases, courts routinely consider undisputed attachments to plaintiff's complaint when deciding motions for judgment on the pleadings.  *See, e.g.*, *VoiceAge Corp. v. RealNetworks, Inc.*, 926 F. Supp. 2d 524, 529-30 (S.D.N.Y. 2013) (collecting cases) (granting plaintiff's Rule 12(c) motion as to defendant's liability for breach of contract, on the basis of attached contract documents).

Ameriserv's complaint is largely premised on the terms of the Subordination Agreement, the contracting officer's written reports and actions, and the contracting officer's final decision with respect to Westar's lease and the Subordination Agreement.  The documents are quoted at length in and attached to the amended complaint, and the government both admits and relies upon these documents in its answer and briefs.  *See supra*, at 2-7 (listing defendant's admissions of the complaint's various allegations and considering the government's averments in its amended answer that various exhibits are "the best evidence of [their] contents").

## ANALYSIS

### A. *Whether Undisputed Facts Establish Breach of Contract*

"To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach."  *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989); *see also Hercules Inc. v. United States*, 24 F.3d 188, 197 (Fed. Cir. 1994) (applying *San Carlos* to claims for breach of warranty), *aff'd*, 516 U.S. 417 (1996).[6]

#### 1. *Whether a valid contract exists.*

The government does not contest Ameriserv's prima facie case that the Subordination Agreement is a valid contract.  Instead, it argues that the Subordination Agreement either was not breached or is void or unenforceable on the basis of the government's affirmative defenses. Def.'s Opp'n at 10-11.  Owing to the government's failure to contest the Subordination Agreement's validity apart from its affirmative defenses, and upon review of the undisputed facts set out in the amended complaint and amended answer, the court concludes that the Subordination Agreement is a valid contract.  *See Spectrum Sciences v. United States*, 84 Fed.

---

[6]Because Ameriserv seeks only partial judgment on the pleadings regarding liability on Count One, the court will not address element (4) of the criteria for establishing a breach of contract.  *Cf. DMS Imaging, Inc. v. United States*, 123 Fed. Cl. 645 (2015) (addressing only causation and damages, after a prior opinion determined the government's liability for breach of contract).

Cl. 716, 735 (2008) (concluding, without discussion, that a contract was valid when the government did not contest the issue but instead argued the contract was not breached).

   2. *Whether the government breached any duties imposed by the contract.*

   Ameriserv avers that the government breached warranties contained in the Subordination Agreement.  Pl.'s Mot. at 18-19.[7]  To prevail in an action for breach of warranty, plaintiff "must establish that the [defendant] provided a warranty either explicitly or implicitly in its contract by showing that: '(1) the [g]overnment assured the plaintiff of the existence of a fact, (2) the [g]overnment intended that plaintiff be relieved of the duty to ascertain the existence of the fact for itself, and (3) the [g]overnment's assurance of that fact proved untrue.'"  *Oman-Fischbach Int'l (JV) v. Pirie*, 276 F.3d 1380, 1384 (Fed. Cir. 2002) (quoting *Kolar, Inc. v. United States*, 650 F.2d 256, 258 (Ct. Cl. 1981)).  "[A] warranty is an assurance by one party to an agreement of the existence of a fact upon which the other party may rely."  *Dale Constr. Co. v. United States*, 168 Ct. Cl. 692, 699 (1964).  "[I]t is intended precisely to relieve the promisee of any duty to ascertain the facts for himself."  *Id.*  Whether the contract creates a warranty is a question of law that begins with the language of the agreement.  *See Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003).  "When interpreting a contract, 'if the provisions are clear and unambiguous, they must be given their plain and ordinary meaning.'"  *Bell/Heery v. United States*, 739 F.3d 1324, 1331 (Fed. Cir. 2014) (quoting *McAbee Const., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996)).  Moreover, when the plaintiff alleges a warranty by the government encompassing the actions of a third party, that warranty must appear in "unmistakable terms."  *Oman-Fischbach*, 276 F.3d at 1385 (citing *Lenry, Inc. v. United States*, 297 F.2d 550 (Ct. Cl. 1962)).

   (a). *Unmistakable assurances.*

   The Subordination Agreement is a fully integrated contract,[8] which states that as "[a] condition to the implementation of the Loan, Bank has requested Government *confirm certain matters* with respect to the lease mentioned in Subsection A afore; and Bank *would not grant the Loan* to Borrower *but for* the execution of *this Agreement* by Government."  Subordination Agreement ¶ C (emphasis added).  Immediately following this statement is a heading titled "Section 1: Representations and Warranties." *Id.* § 1.  In that Section, the government explicitly "represent[s] and warrant[s]" that "[t]he Lease is in good standing, in full force and effect, and has not been modified, altered, or amended[,]" and "[t]o the date hereof, Borrower has timely performed all its obligations under the Lease, and no events have occurred which, with notice,

---

   [7]Ameriserv's complaint also alleged that the government breached Subordination Agreement § 2.1, which gave Ameriserv certain rights to cure any default by Westar.  Ameriserv's motion and briefs, however, are directed at the warranties contained in Sections 1.2 and 1.5, not Section 2.1.

   [8]Section 9 of the Subordination Agreement provides that "[t]his Agreement sets forth the entire agreement and understanding between the parties as to the subject matter of this Agreement and merges and and shall supersede all prior agreements, commitments, representations, writing, negotiations and discussions between them."

the passage of time, or both, would constitute a default under any provisions of the Lease obligatory on Borrower." *Id.*

This contractual language expressly and unmistakably creates a warranty. Although "formal words, such as 'warrant' or 'guarantee,' are not required to create a warranty," *Northrop Grumman Info. Tech., Inc. v. United States*, 78 Fed. Cl. 45, 49 (2007), they strongly support the conclusion that the contract contains a warranty. *See Agredano v. United States*, 595 F.3d 1278, 1281-82 (Fed. Cir. 2010) (finding contract did not contain a warranty in part because the contract said sale was "without warranty or guarantee"); *see also Black's Law Dictionary* 1493 (10th ed. 2014) ("Representation" refers to "[a] presentation of fact. . . made to induce someone to act, esp. to enter into a contract"); *Merriam-Webster's Collegiate Dictionary* 993 (10th ed. 1998) ("representation . . . an incidental or collateral statement of fact on the faith of which a contract is entered into"). Sections 1.2 and 1.5 contain assurances of factual matter about the present state of things, *see* Subordination Agreement § 1.2 ("Lease is in good standing, in full force and effect"), and about past events, *see id.* § 1.5 ("[N]o events have occurred which, with notice, the passage of time, or both, would constitute a default."). And, as confirmed by Paragraph C, these assurances of fact served as an inducement to contract because Ameriserv would not have loaned money to VA Butler Partners without the government's "confirm[ing]" these matters. *Id.* ¶ C.

Accordingly, the court concludes Sections 1.2 and 1.5 "assured the plaintiff of the existence of a fact" in "unmistakable terms." *Oman-Fischbach*, 276 F.3d at 1385.

(b). *Reliance.*

Paragraph C of the Subordination Agreement expressly contemplates Ameriserv's reliance upon the government's express warranties, because it states that Ameriserv "would not grant the Loan to [b]orrower but for" the government's "confirm[ation of] certain matters with respect to the lease." In the next paragraph, the Agreement further states that "in consideration of the premises, the covenants, conditions, provisions, and agreements set forth," the parties "agree as follows." Subordination Agreement at 2 (unnumbered paragraph). This language in a fully integrated contract establishes that "defendant, as well as plaintiff, relied upon the affirmation" in Sections 1.2 and 1.5 "as part of the basis of the bargain." *Everett Plywood & Door Corp. v. United States*, 419 F.2d 425. 431 (Ct. Cl. 1969) (concluding that language in government's contract prospectus, requiring bid on a specific quantity of merchantable timber, proved that both parties "relied" upon "the affirmation that there were [the stated quantities of] merchantable timber"); *see also Dale Constr. Co.*, 168 Ct. Cl. at 698 (government's statement that water was turned off showed contractor's reliance, when contractor notified government "that it needed the water shut off" to do the pertinent work).

The government argues that disputed issues of fact exist regarding reliance because its answer denied that the government knew or should have known Ameriserv was relying on the Subordination Agreement. Def.'s Opp'n at 14-15 (citing Am. Answer ¶ 101). The court is not persuaded. The Subordination Agreement is a fully integrated contract, and it expressly states that the plaintiff is relying upon the government's "confirm[ing]" the matters stated in Sections 1.2 and 1.5 "in consideration" of making the loan. Subordination Agreement ¶ C. The government cannot argue that Ameriserv did not rely on these assurances when the fully

integrated contract itself states these assurances are the inducements by which Ameriserv has agreed to contract.  *See VoiceAge Corp.*, 926 F. Supp. 2d at 531 (noting defendant cannot contest a Rule 12(c) motion by arguing that a contract lacked consideration, when the contract itself recited the consideration).  It is well-settled that when a party's allegations are refuted by an attached contract, the court need not accept the allegation.  *See, e.g.*, *Foshee v. Daoust Constr. Co.*, 185 F.2d 23, 25 (7th Cir. 1950) (holding that the "terms of a written contract attached as an exhibit" must "prevail over the averments differing therefrom"); *see also In re United States Office Prods. Co. Secs. Litig.*, 251 F. Supp. 2d 58, 71 (D.D.C. 2003) (calling this rule "elementary," and then relying upon contract attachments differing from complaint's allegations).

(c). *Assurances proved to be untrue.*

The undisputed facts establish that the assurances contained in Sections 1.2 and 1.5 proved to be untrue.  Ameriserv has alleged that Westar committed fraud by making false statements during the procurement and that this fraud resulted in the lease being terminated for default and being found void *ab initio*, and defendant admits that these allegations are true.  Am. Compl. ¶ 50; Am. Answer ¶ 50; *see also* Am. Compl. ¶ 43; Am. Answer ¶ 43.  These admissions in the answer are "judicial admissions" and thus "render the facts contained therein indisputable."  *E.C. McAfee A/C Bristol Metal Indus. of Canada Ltd. v. United States*, 832 F.2d 152, 154 n.* (Fed. Cir. 1987) (observing that government could not dispute a fact it admitted in its answer).  Consequently, the lease was not "in full force and effect."  Subordination Agreement § 1.2.  Correlatively, contrary to the government's assurance that "no events have occurred which, with notice, the passage of time, or both, would constitute a default," events had occurred that did constitute default.  *Id*. § 1.5.  Because the government's assurances in Sections 1.2 and 1.5 proved untrue, the government breached these express warranties.  *See Dale Constr. Co.*, 168 Ct. Cl. at 699 (finding government breached express warranty when it told contractor that water had been shut off, when in fact the water was not shut off).

The government contends that there is a dispute of fact regarding *when* the government learned of Westar's fraud.  Def.'s Opp'n at 13-14.  The government says that, in fact, it learned of Westar's misconduct only after signing the Subordination Agreement.  *Id.*  But that argument fails as a matter of law because that fact is not material.  *New Zealand Lamb*, 40 F.3d at 380 (to prevent judgment on the pleadings, a disputed fact must be material).  The question for the court is not when the government became aware of Westar's misconduct, but whether the government's assurances proved untrue.  The undisputed facts establish that they did.  By providing a warranty, the government assumed the risk that these facts would prove untrue, and so it does not matter when the government learned of the facts.

B. *Whether Defendant's Affirmative Defenses Bar Judgment on the Pleadings*

The government asserts affirmative defenses of fraud, mistake, failure of conditions precedent, and prior material breach.  Def.'s Opp'n at 10, 25, 29, 30.  Notably, each of these defenses fails to satisfy the pleading standards set out in this court's rules.  The government has extensively argued in its brief and at the hearing that the Subordination Agreement is void due to Westar's fraud in the procurement, yet its answer does not affirmatively allege fraud at all,

despite the requirement of Rule 8(c), let alone with specificity as required by Rule 9(b).  *See* Am. Answer ¶¶ 119-124 (listing six affirmative defenses, but not fraud).  The government's other defenses are procedurally flawed because they are pleaded in conclusory fashion with no factual support, contrary even to lenient notice-pleading standards.  This is especially problematic because Rule 9 requires defendant's affirmative defenses of mistake and denials of conditions precedent to be pleaded with particularity.  RCFC 9(b), (c).  Inadequately pleaded defenses cannot prevent judgment on the pleadings for a plaintiff.  *Westport*, 76 F. Supp. 3d at 882.

Despite this inadequate pleading, the court will proceed to the merits of the government's affirmative defenses.  In its brief and at the hearing on the pending motion, the government presented the factual and legal grounds for each of its defenses.

1. *Fraud.*

Defendant contends that because Westar's fraud tainted its hospital lease and thus made it void, that fraud also taints and voids the Subordination Agreement between Ameriserv and the government, even though Ameriserv was neither involved in nor aware of Westar's fraud.  Def.'s Opp'n at 10.  As a general rule, "a [g]overnment contract tainted by fraud or wrongdoing is void *ab initio*."  *Godley v. United States*, 5 F.3d 1473, 1476 (Fed. Cir. 1993) (citing *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 564 (1961), and *J.E.T.S., Inc. v. United States*, 838 F.2d 1196, 1200 (Fed. Cir. 1988)).  "A contract without the taint of fraud or wrongdoing, however, does not fall within this rule."  *Id.*  Thus the void-for-fraud rule does not extend to cases "where a completely innocent contractor entered a contract with the [g]overnment which, despite illegal conduct by [another party], was nonetheless wholly untainted by fraud."  *Id.* at 1475 & n.2 (citing precedents for the proposition "that innocent bidders should recover on contracts not 'palpably illegal,'" meaning contracts for which the contractor neither took part in nor was aware of an illegality); *see also United States v. Amdahl Corp.*, 786 F.2d 387, 395 (Fed. Cir. 1986) ("'[T]he binding stamp of nullity' should be imposed only . . . because of some action or statement *by the contractor* . . . , [but] if the contractor did not contribute to the mistake . . . , the award should not be considered plainly or palpably illegal." (emphasis added) (quoting *In re Director, Def. Supply Agency*, 52 Comp. Gen. 215 (1972) (in turn quoting *John Reiner & Co. v. United States*, 325 F.2d 438, 440 (Ct. Cl. 1963), and citing *Warren Bros. Roads Co. v. United States*, 355 F.2d 612, 615 (Ct. Cl. 1965)))).

Here, the government makes no allegation of fraud against Ameriserv and further concedes that it has no reason to believe Ameriserv committed any wrongdoing.  Hr'g Tr. 36:6-24 (Feb. 25, 2016), ECF No. 40;[9]  *see also* Am. Answer (making no allegation of fraud against Ameriserv); Def.'s Opp'n (making no argument that Ameriserv committed fraud or had knowledge of Westar's fraud).  In short, Westar's fraud during the procurement cannot be imputed to Ameriserv, a lender to whom Ameriserv (*i.e.*, VA Butler Partners) applied for financing after award.  In these circumstances the court cannot find Ameriserv's Subordination Agreement with the government void.  *See Godley*, 5 F.3d at 1475 n.2 (finding this court's precedents "protected a contractor innocent of wrongdoing"); *see also American Heritage Bancorp. v.*

---

[9] Further citations to the transcript will omit the date of the hearing.

*United States*, 56 Fed. Cl. 596, 612 (2003) (dismissing government's fraud claim upon finding it failed to allege facts imputing agent's fraud to his principal (the contractor-plaintiff)).

During oral argument, government counsel said that the government cannot now allege wrongdoing by Ameriserv but that perhaps after discovery it will be able to do so. Hr'g Tr. 36:6-24. That suggestion is unavailing. Rule 9(b) requires fraud allegations to be pleaded with particularity. One purpose of Rule 9(b) is to "safeguard" against "frivolous accusations of moral turpitude." *United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004) (quoting *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981)). Since 2012, the government has conducted multiple investigations into the procurement. The VA Inspector General has performed two separate and wide-ranging investigations, one in 2013 and another in 2014, yielding two full reports. These investigations included the use of the Inspector General's subpoena powers. *See* First OIG Report at 3. In addition, the contracting officer and the FBI investigated Mr. Berryhill and Westar regarding the procurement. Am. Compl. ¶ 73, Ex. T at 13; Am. Answer ¶ 73. The FBI specifically investigated Westar's hospital lease, asking the VA for all proposals submitted by Mr. Berryhill and Westar. *Id.* Given the applicability of Rule 9(b) to this case, and owing to these investigations, the court will not grant the government leave to amend its answer (for a second time) to add an affirmative defense of fraud. No grounds exist to support an allegation of fraud against Ameriserv.

2. *Mistake.*

The government asserts the affirmative defense of mistake, arguing that it, or Ameriserv, or both, were under the mistaken belief "that Westar's lease was obtained fairly, when in fact, it was obtained by fraud." Def.'s Opp'n at 26. To avoid a contract for mistake, a defendant must show it does not bear the risk of the mistake. *See Restatement (Second) of Contracts* § 152 (mutual mistake)*,* 153 (unilateral mistake) (1981). Thus, at the pleadings stage, if the contract shifts the risk of the alleged mistake to defendant, the defendant cannot assert the defense of mistake. *See, e.g.*, *MAN Roland Inc. v. Quantum Color Corp.*, 57 F. Supp. 2d 576, 581 (N.D. Ill. 1999) ("Because this court has previously found this [contract] provision to be operative and this provision allocates the risk of loss to [defendant], [defendant's] affirmative defenses of mutual mistake and unilateral mistake fail to state a claim."). Here, the court has determined that Sections 1.2 and 1.5 contain the government's express assurance that Westar's lease was "in full force and effect" and that and "no events have occurred which, with notice, the passage of time, or both, would constitute a default." Because the contract placed upon the government the risk that Westar's prior misconduct invalidated the lease, the mistake defenses fail.

3. *Failure to satisfy conditions precedent.*

The government's amended answer asserts that Ameriserv's "claims are barred, in whole or in part, because conditions precedent to enforcement of the S[ubordination Agreement] have not been satisfied." Am. Answer ¶ 120. Because this defense was pleaded in conclusory fashion, it is not apparent what condition precedent failed to occur. The government's brief seeks to fill this gap by explaining that its "affirmative defense concerning the failure to satisfy a

condition precedent is primarily targeted to [Ameriserv's] allegation that the United States breached section 2.1 of the S[ubordination Agreement]." Def.'s Opp'n at 30.

Ameriserv's complaint asserts several distinct theories of breach. One theory is based on warranties contained in Sections 1.2 and 1.5, which the court has addressed *supra*. Another theory is based on Section 2.1, which gave Ameriserv limited rights to cure a default by Westar. The government's brief asserts that Westar's misconduct was incurable, and thus Ameriserv never had a right to cure under Section 2.1. This elaboration of the cryptically pleaded conditions-precedent defense is inapposite because the court's decision is based upon the express warranties and assurances set out in Sections 1.2 and 1.5, not the cure rights stated in Section 2.1.

4. *Prior material breach.*

Like the government's conditions-precedent defense, the government's "prior material breach defense [is] focused on the [plaintiff's] allegation that the United States is liable for breach of section 2.1 of the S[ubordination Agreement]." Def.'s Opp'n at 30. The defense is accordingly not relevant to this court's finding that the express warranties in Sections 1.2 and 1.5 were breached. But alternately, this defense fails as a matter of law. The government asserts in its brief that a loan agreement between VA Butler Partners, Fifth Third Bank, and Ameriserv contains a clause that improperly assigns VA Butler Partners' interest in the lease and rents to Fifth Third Bank and Ameriserv. Def.'s Opp'n at 30; *see also* Def.'s Opp'n at 28 (citing Am. Compl. Ex. J at 2, ¶ G). The government further contends that it did not consent to such assignment,[10] and that the assignment breached an unidentified provision of the Subordination Agreement. In no part of its pleadings or argument, however, has the government pointed to a provision of the Subordination Agreement that has been breached by Ameriserv. *See, e.g.*, Def.'s Opp'n at 30 (asserting prior material breach but failing to state which provision was breached). And, contrary to the government's position, notably, Section 3 of the Subordination Agreement actually acknowledges and approves that assignment of interest so that the lease could serve as security for the loans. Because of Section 3, such an assignment could not be a breach of the Subordination Agreement.[11]

_____

[10]The government seems to be referring to the anti-assignment provisions of what is now 41 U.S.C. § 6305, barring assignment of contracts with the government absent approval by the government. If that provision indeed is the one to which the government is referring, the government does not address the financing-institution exception set out at 41 U.S.C. § 6305(b).

[11]In Section 3, the government "subordinate[d] its rights under the Lease at all times and in all respects to the terms, conditions and provisions of the mortgage and/or security interests (the "Mortgages") which will secure repayment of the Loan and to all renewals, modifications, replacements and extensions thereof." Section 3 elaborated that "[t]he Lease is and shall at all times be and continue to be subject and subordinate in all respects to the Mortgages and to all renewals, modifications, replacements and extensions thereof." Section 9 further provided that "[w]hen inconsistent with the provisions of the Lease, the provision[s] of this Agreement shall be paramount and control." To the extent the government raises the Anti-Assignment Act as a bar, the acknowledgement and assent of Section 3 resolves it. *See Tuftco Corp. v. United States*, 614 F.2d 740, 745 (Ct. Cl. 1980).

C. *Synposis*

The material facts of this case are not in dispute.  The court has considered the arguments of both parties on the merits and concludes that Ameriserv has met its burden of showing a breach of contract.  The court also concludes that the government's affirmative defenses are inadequate as a matter of law.  As an alternate and independent ground for decision, the court additionally finds the government's affirmative defenses of fraud, mistake, and failure of conditions precedent all fail to meet the pleading standard of Rule 9 and therefore cannot bar judgment on the pleadings.[12]

## CONCLUSION

The government breached the express warranties contained in Sections 1.2 and 1.5 of the Subordination Agreement.  Accordingly, Ameriserv's motion for partial judgment on the pleadings as to liability for breach of contract is GRANTED.  On or before April 18, 2016, the parties shall file a Joint Status Report addressing a plan and schedule for further proceedings, including proceedings regarding damages caused by the breach.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge

---

The government also attempts to re-formulate this argument as a theory of unilateral mistake.  In the government's view, an unapproved assignment would result in the government's "unilateral mistake regarding the identity of the lessor given that [Ameriserv] orchestrated the unapproved assignment of the lease to itself."  Def.'s Opp'n at 28.  But because Section 3 of the Subordination Agreement sets out the government's assent to and recognition of the financing arrangement, that argument fails.

[12]Because of this alternate holding regarding the government's affirmative defenses, the court *sua sponte* raises the issue of a possible further amendment of the government's previously amended answer.  Pursuant to RCFC 15(a), the court may grant leave to amend a pleading when justice so requires but need not do so if amendment would be futile.  Regarding fraud, the government acknowledges that it has no grounds to allege fraud against Ameriserv, even after extensive investigations by the FBI, VA Inspector General, and the contracting officer.  Hr'g Tr. 36:6-24.  Defendant's remaining defenses are contradicted by the contract itself (mistake) or directed at provisions other than the express warranties in Sections 1.2 and 1.5 (conditions precedent, prior material breach).  In these circumstances leave to amend would be futile.  *See Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1359 (Fed. Cir. 2011) (affirming district court's denial of leave to amend the answer to add affirmative defenses and counterclaims of fraud, when the court previously determined those same claims and defenses were inadequate as a matter of law).